## THE STATE v. EDWARD SOPER, Appellant.

### Division Two, December 10, 1907.

1. **LARCENY: Identification of Property: Sufficiency of Evidence.** The evidence in this case—a prosecution for larceny—is held sufficient to identify the property, charged to have been stolen, as that of the prosecuting witness.

2. ———: **Different Property: Taken at Same Time: Motion to Elect.** Where the property charged to have been stolen—in this case a mare and some cows—was all taken at the same time, there was but one offense, and the trial court properly overruled a motion to require the State to elect "upon which property in the information it will proceed to trial."

3. ———: **Intent: Completed Offense: Disposition of Property Thereafter.** If the removal of the property by defendant was with the felonious intent of stealing it, the larceny was then complete, and what he may thereafter have done with the property was immaterial except in so far as it tended to show his guilt.

4. ———: **Incompetent Evidence: Taken Away from Jury.** Where, in a prosecution for larceny, a witness was permitted to testify to a conversation between defendant and his wife over the telephone in regard to their domestic troubles, and the testimony was objected to by defendant and the objection sustained, and the court instructed the jury not to consider the testimony, "as it was not competent in any way, shape or form," it cannot be said that the admission of the testimony was prejudicial to the defendant.

5. ———: **Purchased by Check: Title to Property: Evidence.** Where defendant accepted a check from the prosecuting witness with the understanding and agreement between them that he was to purchase therewith property for her, and he used the check for other purposes, without the consent of the prosecuting witness, and bought the property with other checks or money, and she afterwards, by and with the consent of defendant, had possession of the property thus purchased for her, such property was as much hers as if paid for with her check.

6. **EVIDENCE: Exclusion: No Exception.** The action of the trial court in striking out evidence cannot be considered in the appellate court if no exception was saved at the time.

7. **LARCENY: Purchase of Other Property: Immaterial.** Evidence as to the purchase by defendant of other property than that charged to have been stolen was immaterial, and was properly excluded.

8. ———: Publicity: Completed Offense. Evidence as to the pub-
licity of defendant's actions with regard to the property charged
to have been stolen is not admissible where such actions take
place after the larceny is complete.

9. ———: Flight: Evidence: Instruction. Where the evidence
shows that immediately after the sale of the property defendant,
instead of returning home as he had stated he would, went to an-
other State, where he remained several months, and that when
he returned to this State, he did not return to his home, and
stated to the officer who arrested him that he "ought to have
known better than to come back here," there is ample evi-
dence on which to base an instruction on flight.

10. ———: Claim of Title: Instructions. An instruction given for
the State held not to put on defendant the burden of showing
that he took the property under the belief that it was his own,
when read in connection with defendant's instructions 5 and 6,
set out in the opinion.

11. ———: Too Many Instructions. The giving of numerous and
repetitious instructions has always been disapproved by this
court. Five or six pointed instructions for the State, in this
prosecution for larceny, would have covered the case as well as
it was covered by the seventeen instructions given for the
State.

Appeal from Clinton Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*R. H. Musser* and *W. S. Herndon* for appellant.

(1) The court should have given the peremptory instruction to find defendant not guilty, asked by defendant at the close of the evidence in chief, and also at the close of all the evidence, because the evidence failed to show that the property alleged to have been stolen was the property of the prosecuting witness, and did not show any wrongful taking, which would support a conviction of larceny. 18 Am. and Eng. Ency. Law (2 Ed.), 469; Hall v. Adkins, 59 Mo. 144; State v. Campbell, 108 Mo. 611; State v. Littrell, 170 Mo. 13; State v. Blair, 71 S. W. 482; State v. Tyler, 70 S. W. 750; State v. Spears, 69 S. W. 533; State v. Francis, 199 Mo.

671; State v. Scott, 177 Mo. 665; State v. Mooney, 196
Mo. 43; State v. Crabtree, 170 Mo. 642; State v. Mahan, 138 Mo. 112; State v. Marshall, 47 Mo. 378.    (2)
The court should have sustained defendant's motion
to require the State to elect, asked by him at the close
of the State's evidence in chief.  If there was any larceny, then the larceny of the horse occurred at a different time from that of the cows, the horse being shipped
to Illinois Monday, December 4, 1905, and the cows to
Kansas City, Tuesday night, December 5, 1905.  State
v. Palmberg, 199 Mo. 233; State v. Hillberg, 22 Utah
27; People v. Clark, 33 Mich. 112.    (3)    The court
should have permitted witness Packard to testify as
to the disposition of that part of the $763.58 check, given by the prosecuting witness to defendant not deposited by defendant to his credit in the Farmers Bank
of Cameron.  The court should also have permitted defendant to have testified as to what disposition was
made of the balance of said check, deposited to defendant's credit, in said bank.  This testimony would have
shown conclusively that not a dollar of said check was
expended by defendant in the purchase of the mare or
cows alleged to have been stolen.  (4)  The court should
have permitted defendant to testify in regard to the
publicity of his action in the shipping of the cows and
mare, and as to who was present at said time.

*Herbert S. Hadley,* Attorney-General, and *N. T.
Gentry,* Assistant Attorney-General, for the State.

(1)  No error was committed in overruling defendant's application for the State to elect whether it would
prosecute the defendant for the larceny of the mare or
the cows.  According to the evidence the mare was shipped out from Cameron on Monday, but the cattle were
not shipped out from that station till Tuesday.  But
the larceny of both mare and cows was committed at the
time the defendant took them from the farm of Mrs.

Croft, which was on Monday, December 4, 1905.   (2)
The evidence for the State was amply sufficient to jus-
tify the jury in convicting defendant.   Hinshaw v.
State, 147 Ind. 362; Walker v. State, 49 Ala. 400; Peo-
ple v. Arnold, 43 Mich. 305; 4 Elliott on Evidence, sec.
2723; State v. Bonner, 64 Me. 289; State v. Dickson,
78 Mo. 448; State v. Ferguson, 162 Mo. 678.

BURGESS, J.—At the September term, 1906, of
the circuit court of Clinton county, under an informa-
tion filed by the prosecuting attorney charging the de-
fendant with the larceny, on December 4, 1905, of one
sorrel mare and three red cows, the property of Mrs.
Euphemia Croft, the defendant was convicted, and his
punishment assessed at two years in the penitentiary.
The court having overruled motions for new trial and
in arrest of judgment duly filed by defendant, he ap-
peals.

It appears from the evidence that the defendant,
his wife and wife's grandmother, the latter being Mrs.
Euphemia Croft, the prosecuting witness, lived togeth-
er on a farm three and one-half miles from Cameron,
Missouri, and that they went on this farm in November,
1904; that Mrs. Croft, who was seventy-five years of
age, owned the farm, and the defendant was in charge
of and operated it, hiring the help, cultivating the
crops and paying the expenses in connection therewith,
the money therefor being supplied by Mrs. Croft; that
in addition to this, the defendant, on his own account,
bought and shipped a good deal of cattle and other
stock, which stock was kept and fed on the farm be-
fore being shipped to market.

In March, 1905, Mrs. Croft received a draft for
$951.68, the proceeds of the sale of some lands in Illi-
nois, which draft was deposited for her by the defend-
ant in the Farmers Bank of Cameron, less $70 sub-
tracted therefrom by the defendant, which he testified

was used by him to pay some bills owing by Mrs. Croft. This deposit was afterwards augmented by the deposit of the interest on a note owing her, the whole amount to her credit in the bank being $1,031. On April 20, 1905, Mrs. Croft gave a check to the defendant for $763.58 on the Farmers Bank, which check, according to her testimony, was given by her to pay for a young sorrel mare, four milk cows and some calves purchased for her by the defendant about that time, with the larceny of which mare and three of the said cows the defendant is charged in the information.

On April 21, 1905, the check for $763.58 was deposited by defendant in the Farmers Bank, and out of which was deducted the sum of $179.70 to cancel notes for which he was indebted to the bank, the residue of $583.88 being placed to his credit in the bank. He had nothing more to his credit at the bank at the time, and the testimony showed that this balance was withdrawn by various checks of defendant prior to May 13, 1905. On trial the defendant offered an explanation of the disposition of the check in question, and to prove that of the money so deposited none was used to pay for the cows and horse in controversy, but his offers were refused by the court.

The defendant, on May 13, 1905, purchased from one Lee Hainline the sorrel mare in question, for which he gave a check for $85 on the Farmers Bank, by reason of which check and others previously drawn his account with the bank was overdrawn to the extent of $187.07, which overdraft was, on May 25, 1905, balanced by a note.

The mare purchased from Hainline was but three years old, and unbroken at the time for driving purposes. She was used principally by the defendant as a saddle horse, and only on one or two occasions was she used by Mrs. Croft, the animal on each occasion being driven by the defendant.

On December 4, 1905, the date of the alleged larceny, the defendant used this horse in driving forty-four head of cattle to Cameron, he being accompanied by Roy Smith, a young man who worked on the farm at that time.   Among the herd were seven red cows and two bulls.   At noon that day the defendant shipped the horse from Cameron to Putnam, Illinois, the cattle remaining at Cameron until the night of the next day, when they were shipped by defendant to Kansas City.   It appears that the Farmers Bank had a mortgage on all of these cattle to secure notes for money borrowed by the defendant to pay for some of them, and that the shipment was made in the name of the bank.   The defendant did not return after making these shipments, but went to his father's home at Putnam, Illinois, and this information against him was filed December 22, 1905.   He was arrested the following spring at Altamont, Missouri, a town some miles distant from Cameron, the marshal of Cameron having overheard the defendant talking over a telephone line between Cameron and Altamont, and the marshal of the latter town, being notified of defendant's presence there, arrested him.   The marshal who made the arrest stated in his testimony that when he made the arrest he informed the defendant that he was charged with grand larceny, and that defendant remarked he "ought to have known better than to come back here;" that defendant also said that he and his wife had had frequent quarrels, that he left her on that account and that his object in coming there was to talk to her over the telephone and try to fix the matter up.

Mrs. Croft testified positively that she gave defendant the check for $763.58 for the purpose of purchasing a horse and some cows for her, and that defendant did purchase them for her.   She was an old woman and seldom went out, and she was unable to remember from whom the animals were purchased or to

describe the cows accurately, but she knew "there was one red cow and one spotted cow." She stated that on the morning the defendant drove away the cattle she asked him what he was going to do with the mare, and that he said he was going to take her to town and would ride her back; that she did not know at that time that the cows in controversy were among the cattle which defendant drove away, but that Roy Smith told her about it next morning.

Roy Smith, testifying for the State, said that he worked on Mrs. Croft's farm from October 1st to December 8, 1905, that he assisted the defendant in driving forty-four head of cattle from the farm to Cameron on December 4, 1905, and that among the cattle were several cows, "red cows, spotted cows and roan cows." Witness said that after arriving at Cameron the defendant told him that he had sold the mare to one Howard Loomis, and requested him not to say anything about it. The mare, witness said, was shipped to Illinois by defendant about 1 o'clock on Monday, December 4th, and the cattle were shipped to Kansas City the following Tuesday night. Witness further said that defendant sold a lot of cattle in November, and that some of the cattle shipped in December were bought by the defendant before he, witness, began to work on the farm, and some afterwards. Some time in October witness had a conversation with the defendant, and the latter said that he purchased twenty-eight of the cattle on the farm from one McLaughlin, and that "Mrs. Croft furnished the money to buy the mare and stock." Witness milked the cows on the farm, and said there was one red cow, one spotted and one roan cow.

Defendant testified in his own behalf, and stated that in the shipment of forty-four cattle on December 4, 1905, were seven red cows, and were purchased by him as follows: One of John Myers on January 21, 1905; two of John Gorrel in November, 1905; one

of Everett Kester in November, 1904; one of E. M. Charlton on November 25, 1904; one of Dr. Franklin, at a sale in November, 1905, and one procured by a trade with William Hauger. The defendant, in support of his testimony, introduced in evidence the cancelled checks paid for these cows, and his testimony was in no way disputed. The court refused to permit the defendant to show from whence the funds were derived for the purchase of the cattle, but the checks and bank books in evidence showed that none of the cows were puchased with the check for $763.58 given him by Mrs. Croft on April 20, 1905. The testimony further showed that the sorrel mare which the prosecuting witness claimed as hers was not purchased until twenty-two days after the giving of this check, and was not paid for out of said check, but by an overdraft on the Farmers Bank, May 14, 1905, which overdraft was balanced by a note and mortgage given the bank by defendant, May 25, 1905. The testimony of John Hainline, from whom the animal was purchased, was the same as that of the defendant regarding the date of the sale and the manner of payment, and it was further shown that defendant did not see the animal until a few days before the purchase. Defendant claimed all the animals shipped by him in December, 1905, as his own, and that not one of them was purchased with the proceeds of the check given him by the prosecuting witness, nor at the time stated by her in her testimony.

The defendant offered to show that on the 8th day of February, 1905, he bought from one Henry Ziegenbein a certain sorrel mare, seven years old, that he paid Ziegenbein for that mare by executing to the Farmers Bank of Cameron a chattel mortgage on the mare and other animals, and that thereafter, about the 21st day of April, 1905, with the knowledge and consent of Mrs. Croft, the prosecuting witness, and by her direction, he took from the check given him by her a sum sufficient

to pay off the note given for the purchase price of that horse. The court, however, sustained an objection to such testimony on the ground that this was not the mare in controversy.

J. Lake Jones, a witness for defendant, testified that he was a farmer, living near Cameron, and that shortly after the defendant shipped the cattle away he saw Mrs. Croft and presented her with a bill for $81 for corn which he had sold defendant, and that she said "she wasn't going to pay it, because it had been fed to his cattle and he shipped them away."

Wm. Hauger testified for the defendant as follows: "I know Mrs. Croft, who just left the stand, and was at her place, as near as I can recollect, about two weeks after Ed. Soper left. Mr. Jones presented her a bill at that time for corn which she claimed was fed to cattle Mr. Soper took to Kansas City, and she said she was not liable for it because the cattle belonged to Ed. Soper, and she said he fed the corn to his cattle."

Three witnesses for the State testified that the defendant's reputation for truth and morality was bad; and one of said witnesses, on cross-examination, said that he had heard one or two people say that the prosecuting witness told entirely different stories about the matters in controversy.

At the close of the State's case the defendant asked the court for an instruction in the nature of a demurrer to the evidence, and a like request was made at the close of all the testimony, both of which were refused by the court and defendant excepted.

The first contention is that there is no evidence to show that the property alleged to have been stolen was the property of the prosecuting witness, Mrs. Croft, or that there was any wrongful taking which would support a conviction of larceny, and that, therefore, the peremptory instruction to find the defendant not guilty, asked by the defendant at the close of the evidence

on the part of the State, and again at the close of all the evidence, should have been given.

While it is true the evidence on the part of the State as to the ownership and identification of the cows is not as strong and convincing as it should be, we are not prepared to say that there was no substantial evidence that the cows were the property of Mrs. Croft, as alleged in the information. If her evidence is to be believed, the property all belonged to her. On the other hand, if defendant testified truthfully, it all belonged to him, and he was not guilty of either larceny or embezzlement of the mare or cows. The evidence as to the identification and ownership of the property was for the consideration of the jury, and there was, therefore, no error in refusing the peremptory instruction. Neither did the court err in overruling the defendant's motion to require the State to elect, at the close of the State's evidence in chief, "upon which property in the information it will proceed to trial," as the mare and cows were taken from the farm at the same time, and the taking constituted but one offense. If the removal of the property from the farm by defendant was with the felonious intent of stealing the same, the larceny was then complete, and what he may thereafter have done with the property was immaterial except in so far as it tended to show his guilt.

It appears from the record that in February, 1906, defendant was in Altamont, Missouri, and his wife was living on the farm, and that one Mrs. McCune, a witness for the State, was permitted to testify, over the objection of defendant, to a conversation between defendant and his wife over the telephone with respect to their domestic troubles, and which witness overheard. After this testimony was admitted it was objected to by the defendant on the ground that it was incompetent and immaterial and did not tend to prove or disprove any issue in the case. The objection was sustained by

the court and the jury instructed not to consider the testimony, as "it was not competent in any way, shape or form." But defendant now insists that the evidence was prejudicial to the defendant, and, although stricken out, the poison it engendered in the minds of the jury was not removed. It is very clear that this testimony had no bearing whatever upon the issues in the case, and was inadmissible; but as the court, immediately after its admission, directed the jury not to consider it, we are unable to see how defendant could have been prejudiced by its admission, and do not think the judgment should be reversed upon that ground.

It is next contended that the court erred in not permitting C. E. Packard, cashier of the Farmers Bank of Cameron, to testify as to the disposition of that part of the $763.58 check given by Mrs. Croft to defendant not deposited by defendant to his credit in said bank, and that the court further erred in refusing to permit the defendant to show what disposition was made by him of the balance of the check deposited by him in the bank. Defendant claims that this testimony, had it been admitted, would have shown that no part of said check was expended by him in the purchase of the mare or cows in controversy.

It seems that at the time defendant received the check for $763.58 from Mrs. Croft he owed the bank, in notes, $179.70, and that this amount was deducted from the check, and the balance, $583.88, placed to his credit in the bank. There is no contention that this balance was insufficient to pay for the mare and cows in question. In order to vest in Mrs. Croft the title to the property in controversy it was not necessary that it should have been purchased for her with this identical check or its proceeds; but if defendant accepted the check with the understanding and agreement between himself and Mrs. Croft that he was to purchase

therewith for her the mare and cows in question, and he used the check for other purposes, without the consent of Mrs. Croft, and bought the mare and cows, or any of them, with other moneys or checks, and she afterwards, by and with the consent of defendant, had possession of the property thus purchased for her, such property was just as much hers as if paid for with the identical check in question. The law will not permit a person to accept with one hand a check for the specific purpose of purchasing property therewith for the giver, and with the other hand to apply money which he then has to accomplish the same purpose, and then, when the property thus purchased is claimed by the person who gave the check therefor, to claim that it belongs to him because he purchased it with money of his own and not with the check or its proceeds. Such double-dealing should not for one moment be countenanced.

Complaint is made of the action of the court in striking out part of the evidence of A. J. Althouse, a witness for the defendant, but as the action of the court was not excepted to at the time, the question cannot now be considered.

The court refused to permit the defendant to testify that on February 8, 1905, he purchased a sorrel mare from one Henry Ziegenbien, and executed a chattel mortgage to the Farmers Bank of Cameron on said mare and other stock, and afterwards, with the knowledge and consent of Mrs. Croft, paid off said mortgage out of the check given by her. It was conceded by defendant that this was not the mare in question, and it is difficult to see how such evidence could have thrown any light upon any issue in the case, nor do we think it would have done so.

It is also contended that the court should have permitted the defendant to testify in regard to the pub-

licity of his action in the shipping of the cows and mare, and as to the persons who were present at the time of shipment. The argument is that evidence of such character was admissible as tending to show good faith upon the part of the defendant with respect to his claim of ownership. When ''the evidence leaves it in doubt whether or not the property taken was the defendant's or whether the defendant honestly believed either that he was the owner or that he had a right to the possession, publicity of taking is regarded as very strong evidence of the good faith of the defendant's claim.'' [18 Am. and Eng. Ency. Law (2 Ed.), 525; Causey v. State, 79 Ga. 564; State v. Homes, 17 Mo. 379.] No such evidence, however, is admissible after the completion of the offense and which, in the case at bar, if committed at all, was committed and completed at the time defendant took the property from the farm of Mrs. Croft; and it was upon this theory the case was tried. No act or declaration of defendant, in his favor, as explanatory of the taking, was permissible unless it was done or made at the time of the taking or when he was first charged with the offense. The declarations and statements, if any, made at the time as explanatory of his possession of the property in question, were admissible. It is not recorded, however, that defendant made any such statement at the time of the taking.

Defendant asked six instructions which were refused, and this is assigned for error. But there was no error in this, for the court, at the instance of the defendant, gave seven other instructions which were exceedingly fair to him, and covered every point presented by the refused instructions.

The seventeen instructions given at the instance of the State are challenged upon various grounds, but upon a careful reading we find them free from substantial objection, especially so those upon grand larceny.

As to the instructions upon embezzlement, the defendant has no right to complain, as he was not convicted of that offense. We do not, however, intend to be understood as holding that they, or either of them, are erroneous.

The defendant contends that there was no evidence upon which to predicate the sixth instruction for the State in regard to the flight of defendant, after the commission of the alleged offense, for the purpose of avoiding arrest. But this we cannot admit. Immediately after the sale of the cattle in Kansas City, the defendant, instead of returning home as he had stated he would, went to Illinois, where he remained several months, or until the following spring, when he returned to this State, but not to his home or to Cameron, and was arrested at Altamont, Missouri. He stated to the officer who arrested him that he "ought to have known better than to come back here." There was, therefore, ample evidence upon which to bottom said instruction.

The further contention is made that the burden of showing to the satisfaction of the jury that, at the time defendant carried away the property in question, "he did so under the honest belief that it was his own under a fair color of right and title," was erroneously placed upon the defendant by the State's seventeenth instruction. Upon this same question the court, at the instance of the defendant, instructed the jury as follows:

"5. The jury are instructed that even though they may believe from the evidence, beyond a reasonable doubt, that the defendant took and carried away the property in question, yet, if they further believe from the evidence that the defendant took the property under claim of title, honestly entertained, then he is not guilty of larceny, and, in such case, he should be acquitted.

"6. The court further instructs the jury that where property is taken under a claim of right, and

there be any fair claim of right to the property, and the jury believe from the evidence that such claim is made in good faith, then it is the duty of the jury to find the defendant not guilty.''

We do not think the instruction objected to is susceptible of the construction placed upon it by the defendant, but that it fairly submitted the question upon all the evidence. Certainly, when said instruction is taken in connection with defendant's above-quoted instructions, upon the same proposition, there can be no question that this feature of the case was fairly presented to the jury.

The only criticism which we have to make upon the instructions is their number. Five or six pointed instructions upon the part of the State would have covered the entire case, and the issues been more easily comprehended by the jury than by the entire seventeen given. The giving of numerous and repetitious instructions has always been disapproved by this court.

Finding no error in the record prejudicial to the defendant, we affirm the judgment. All concur.